Filed 9/27/13  Landbank Development v. 26 Tierra Subida CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| LANDBANK DEVELOPMENT COMPANY, LLC, | B240555 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. LC088418) |
| v. | |
| 26 TIERRA SUBIDA, LLC, et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Richard A. Adler, Judge.  Reversed.

Reid & Hellyer, David G. Moore, Michael G. Kerbs and Janette L. Acuff for Plaintiff and Appellant.

Drescher Law Firm and Robert E. Drescher for Defendants and Respondents.

_____

Landbank Development Company, LLC (Landbank), appeals from a judgment entered after the trial court sustained a demurrer of Ebby Shakib, Jamshid Goltche, and John Makhani to Landbank's complaint and granted a motion for nonsuit of 26 Tierra Subida, LLC (Tierra), and A.V. Foothills, LLC (Foothills). Landbank contends that the court erred in dismissing by demurrer Shakib, Goltche, and Makhani because the operative complaint had pleaded sufficient allegations of alter ego against them. Landbank also contends that the court erred in dismissing by demurrer Shakib and Makhani because the operative complaint had pleaded specific allegations of intentional and negligent misrepresentation against them. Further, Landbank argues that the court erred in granting the motion for nonsuit because substantial evidence supported one or more causes of action. We conclude that Landbank pleaded sufficient allegations of alter ego against Shakib, Goltche, and Makhani. We also conclude that Landbank pleaded specific allegations of intentional and negligent misrepresentation against Shakib and Makhani. Finally, we conclude that the court erred in granting Tierra and Foothills's motion for nonsuit because substantial evidence supported one or more causes of action against them. Accordingly, we reverse the order sustaining Tierra and Foothills's demurrer as to the allegations of alter ego against Shakib, Goltche, and Makhani; we reverse the order sustaining Tierra and Foothills's demurrer as to the allegations of intentional and negligent misrepresentation against Shakib and Makhani; and we reverse the order granting Tierra and Foothills's motion for nonsuit. The judgment is reversed.

## BACKGROUND

### A. Landbank's purchase of the property

Landbank is engaged in the business of landbanking, which involves investing in undeveloped real property in areas of anticipated development and later selling the real property for profit.

On August 28, 2007, Landbank, as the buyer, and Tierra and Foothills as the sellers, entered into a written purchase and sale agreement (Purchase Agreement) for the purchase of approximately 153 acres of raw land divided among four parcels located "at the intersection of 110th Street West and Avenue 'J'" in Palmdale, California (Property).

2

Article III, section 9.7 of the Purchase Agreement (Disclosure Provision) provided: "Litigation.  Except as otherwise disclosed in the Due Diligence Items or any other information delivered to Buyer, there is no litigation, arbitration, or other legal or administrative suit, action, proceeding or investigation of any kind pending or threatened in writing against or involving Sellers relating to the Property or any part thereof, including, but not limited to, any condemnation action relating to the Property or any part thereof."  (Underscoring omitted.)

The purchase price for the Property was $3.2 million.  Landbank made a deposit of $750,000 and executed two promissory notes in favor of Tierra and Foothills, each in the amount of $1,225,000, secured by a deed of trust on the Property.  On October 10, 2007, escrow closed on the purchase of the Property.  As required, Landbank received approval from the Department of Real Estate to purchase the Property for the purpose of landbanking.  In October 2008, Landbank requested and received an 18-month extension on the two promissory notes.

In February 2009, Landbank received a Notice of Availability and Public Meetings (2009 Notice) from Southern California Edison (Edison) that stated Edison was undertaking a project called the Tehachapi Renewable Transmission Project (Project).  The Project "include[d] a series of new and upgraded high-voltage electric transmission lines . . . and substations to deliver electricity from new wind farms in eastern Kern County, California to the Los Angeles Basin."  The 2009 Notice advised Landbank of public meetings and presentations for property owners who were affected by the Project.  The 2009 Notice stated, "You may own property along the proposed Project alignment or along one of the alternative routes."

On March 18, 2009, Darren Proulx, a managing member of Landbank, attended a meeting hosted by Edison where he saw a map (2009 Map) showing Edison's proposal to construct 145-foot transmission towers carrying 500-kv high voltage electrical transmission lines either "down the east side of the Property . . . [or] in the middle of the Property."

3

At some point, Landbank discovered that on March 19, 2007, Edison had mailed a map (2007 Map) and "initial fact sheets" regarding Edison's suggested route to property owners who could be impacted by the Project. He also discovered that on June 29, 2007, Edison filed an Application for Certification of Public Convenience and Necessity (2007 Application) with the Public Utilities Commission (Commission) and that within10 days of the filing of the Application, Edison had sent an informational packet, including a copy of a Notice of Application for Certification of Public Convenience and Necessity (2007 Notice), to all landowners, including Tierra and Foothills, within 300 feet of the Project and its 200-foot easement.

On August 27, 2007, an administrative law judge held a "Prehearing Conference" in Pasadena. In December 2007, an outside environmental consultant requested Edison to evaluate a West Lancaster alternative. On March 17, 2009, the administrative law judge and a commissioner jointly issued a "Scoping Memo." A public participation hearing was held in Chino Hills on March 19, 2009. According to the Commission's December 24, 2009 "Decision granting a certificate of public convenience and necessity for the [Project]," the West Lancaster alternative was selected as environmentally superior. The Commission stated that the West Lancaster alternative "was suggested by members of the public prior to the scoping period." The West Lancaster alternative rerouted "the new 500k–kV transmission line in Segment 4 along 115th Street West in West Lancaster [through the middle of the Property] rather than 110th Street West."

Edison offered Landbank $350,000 for an easement across the Property. That money ultimately went to Tierra and Foothills. After making a payment in January 2009, Landbank stopped making payments on the promissory notes. On January 19, 2010, Landbank sent Tierra and Foothills a notice to rescind the Purchase Agreement based on Tierra and Foothills's failure to disclose the Project to Landbank prior to Landbank's purchase of the Property. Tierra and Foothills eventually foreclosed on the Property. In July 2010, Edison filed complaints in eminent domain against Foothills and Royal Investment Group, Inc. (Royal) (*Southern California Edison Company v. A.V. Foothills, LLC et al.* (Super. Ct. Los Angeles County, No. BC442098); *Southern California Edison*

4

*Company v. Royal Investors Group, LLC et al.* (Super. Ct. Los Angeles County, No. BC442258)), and the power lines were constructed across the Property.

**B. Landbank's complaint and first amended complaint**

On February 1, 2010, Landbank filed a complaint against Tierra, Foothills, Royal, Shakib, Goltche, and Makhani.

On February 16, 2010, Landbank filed a first amended complaint (FAC), alleging causes of action for rescission, breach of contract, and intentional and negligent misrepresentation. As to the alter ego allegations, the FAC alleged as follows: "[T]here existed a unity of interest and ownership" between Shakib and Goltche on the one hand, and Tierra and Royal on the other, "such that any individuality and separateness between" them has ceased. Tierra and Royal are mere shells through which Shakib and Goltche carried on business and exercised complete control of Tierra and Royal so that any individuality and separateness of Shakib and Goltche on the one hand, and Tierra and Royal on the other, has ceased. Tierra and Royal are the alter egos of Shakib and Goltche. "[T]here existed a unity of interest and ownership between [Makhani] on the one hand, and . . . [Foothills] on the other, such that any individuality and separateness between" them has ceased. Foothills is a mere shell through which Makhani carried on his business and exercised complete control of Foothills so that any individuality and separateness of Makhani on the one hand, and Foothills on the other, has ceased. Foothills is the alter ego of Makhani.

The FAC alleged that the action "involves a written purchase and sale agreement for approximately 153 acres of raw land in [Lancaster], California." On June 29, 2007, Edison, in conjunction with the Commission, "initiated a condemnation proceeding by serving" the 2007 Notice on the owners of the Property at the business address for Foothills. "The [2007 Notice] called for the construction of giant electrical transmission lines through the [Property] and other properties in the area." On August 28, 2007, Tierra and Foothills entered into the Purchase Agreement. The FAC set forth the Disclosure Provision in full and alleged that "[t]he fact that the Condemnation Proceeding was pending while the sale of the Subject Property was in escrow, is inconsistent with the

5

representation and warranty made by [Tierra and Foothills] in [the Disclosure Provision] of the [Purchase Agreement]." On October 10, 2007, escrow closed on the Property. While the transaction was in escrow, Tierra and Foothills did not disclose to Landbank that the 2007 Notice "had been served." Tierra and Foothills did not disclose at any time "that the Condemnation Proceeding was pending." "Landmark had no knowledge of the pendency of the condemnation action while the [Purchase Agreement] was in escrow." Nor was Landbank "aware that [Edison] intended to construct giant electrical transmission lines across any portion of the . . . [Property]."

## C. The demurrers, second amended complaint, and third amended complaint

### 1. *The demurrer to the FAC*

On April 1, 2010, Shakib, Goltche, and Makhani filed a demurrer to the FAC, urging that the FAC is "flawed in its attempt to pierce the corporate veil and hold [them] liable for the actions of the limited liability companies they manage because [Landbank] fails to state facts sufficient to show [they] acted in a tortious or criminal manner." Landbank opposed the demurrer on the ground that the FAC alleged "Shakib and Makhani engaged in tortious conduct by making the knowingly false representation in the [disclosure provision]" and that the FAC made sufficient allegations of alter ego against Shakib, Goltche, and Makhani.

On May 5, 2010, the trial court sustained the demurrer of Shakib, Goltche and Makhani to the FAC with leave to amend on the basis that the allegations "that there exists 'a unity of interest' and that [Tierra and Foothills] are 'a mere shell, instrumentality and conduit'" of the individual defendants were legal conclusions.

### 2. *The second amended complaint*

On May 10, 2010, Landbank filed a second amended complaint (SAC), adding the allegations that Shakib and Goltche failed to follow corporate formalities for Tierra and Royal; failed to hold regular meetings; and "failed to maintain minutes and adequate records to show the separate legal relationship between themselves" and Tierra and Royal. The SAC also alleged the following: "Tierra and/or Royal were used by Shakib and Goltche as a conduit for their personal businesses. . . . Tierra and/or Royal will be

6

unable to satisfy a money judgment in favor of Landbank because Shakib and Goltche have removed Landbank's purchase proceeds from the corporate entity, leaving it unable to satisfy its debts. As is alleged below, the purchase and sale agreement at issue in this action originally called for Landbank's purchase proceeds to be paid to and held by a third party called Investment Property Exchange Services, Inc., to be used by the sellers as part of a tax-deferred exchange of real property . . . After Landbank had made several payments towards the purchase of the property in question, . . . Tierra and Royal had Investment Property Exchange Services, Inc. assign its interest back to them. . . . Shakib and Goltche have since removed Landbank's purchase proceeds from . . . Tierra and from Royal for Shakib's and Goltche's own use and benefit, such that the money is no longer available to . . . Tierra and Royal to repay to Landbank."

The SAC alleged that Makhani failed to follow corporate formalities for Foothills, "failed to hold regular meetings, and failed to maintain minutes and adequate records to show the separate legal relationship between himself" and Foothills. It alleged, "Foothills was used by Makhani as a conduit for his personal business. . . . Foothills will be unable to satisfy a money judgment in favor of Landbank because Makhani has removed Landbank's purchase proceeds from the corporate entity, leaving it unable to satisfy its debts. As is alleged below, the purchase and sale agreement at issue in this action originally called for Landbank's purchase proceeds to be paid to and held by a third party called Investment Property Exchange Services, Inc., to be used by the sellers as part of a tax-deferred exchange of real property . . . . After Landbank had made several payments towards the purchase of the property in question, AV Foothills had Investment Property Exchange Services, Inc. assign its interest back to them. . . . Makhani has since removed Landbank's purchase proceeds from AV Foothills for Makhani's own use and benefit, such that the money is no longer available to AV Foothills to repay to Landbank."

The SAC alleged that by signing the Purchase Agreement, Shakib and Makhani represented as stated in the Disclosure Provision that "there is no litigation, arbitration, or other legal or administrative suit, action, proceeding or investigation of any kind pending

7

or threatened in writing against or involving Sellers relating to the Property or any part thereof, including, but not limited to, any condemnation action relating to the Property or any part thereof." (Underscoring omitted.) It further alleged that Shakib and Makhani made the representation knowing of its falsity or having no reasonable ground to believe its truth, with the intent to induce Landbank to enter into the Agreement and purchase the Property.

Shakib, Goltche, and Makhani demurred to the SAC, again urging that Landbank failed "to state facts sufficient to show the individual defendants acted in a tortious or criminal manner" and claiming that the SAC made conclusory allegations that Shakib, Goltche and Makhani "failed to follow corporate formalities for AV Foothills such as regular meetings, maintaining minutes, and keeping adequate records, but provides **no** facts to support these allegations."

On June 29, 2010, the trial court sustained the demurrer to the SAC with leave to amend as to Shakib, Goltche, and Makhani on the grounds that the SAC had pleaded "nothing more than a series of legal conclusions that there exists 'a unity of interest' and that 26 Tierra and AV Foothills are a 'mere shell, instrumentality and conduit' of Shakib, Goltche and/or Makhani. [Landbank] must [plead] sufficient facts . . . showing alter-ego on behalf of the individually named Defendants." The minute order stated, "Paragraph 27 alleges that the fraud made was done by way of contract." The minute order then set forth the language of the disclosure provision. It stated, "If any fraud made in the contract was committed by the Defendants, there are insufficient facts showing that this language was simply more than a breach of the officer's duty, and there are no facts showing that all individually named defendants knew that the property was worth other than what they sold it for." Landbank had not alleged facts showing whether the corporate defendants were "undervalued or whether assets were commingled." The minute order stated that the SAC alleged that the corporate defendants did not hold "'regular' meetings or keep adequate records. A mere oversight on some occasions does not open up alter-ego liability." The minute order also stated that the SAC had failed to allege the value of the Property following the condemnation proceedings, which "is

8

relevant on the issue of whether the property was overvalued for the personal benefit of the individually named Defendants."

Landbank declined to amend the SAC with respect to the alter ego theory. Shakib, Goltche, and Makhani were dismissed from the action by the trial court on February 3, 2011.

### 3. *The third amended complaint*

On October 28, 2010, Landbank filed a third amended complaint (TAC), alleging, as in the prior complaints, a first cause of action for rescission and restitution, a second cause of action for breach of contract, a third cause of action for intentional misrepresentation, and a fourth cause of action for negligent misrepresentation. As in the previous complaints, Royal was not named as a defendant in the second, third, and fourth causes of action. The TAC added a fifth cause of action against all defendants except Royal for rescission and restitution based on mutual mistake. It also attached a copy of the Purchase Agreement as an exhibit.

The TAC contained an allegation at paragraph 22 that had been alleged in all preceding complaints, providing Landbank "is informed and believes and thereon alleges that, on June 29, 2007, [Edison] initiated a condemnation proceeding by serving a Notice . . . on the owners of the Subject Property and other properties affected by the project. The Notice . . . related to [Edison's] project, entitled, 'Tehachapi Renewable Transmission Project,' which called for the construction of giant electrical transmission lines through the Subject Property and other properties in the area" (Paragraph 22). Paragraph 31 of the TAC (Paragraph 31) stated, "[A]t no time prior to close of escrow was Landbank aware that [Edison] intended to construct giant electrical transmission lines across any portion of the . . . Property." The TAC also added paragraph 66 under the fifth cause of action for rescission (Paragraph 66), alleging, "In the event that representatives of [Tierra and Foothills] were truly unaware [of the] June 29, 2007 Notice . . . by [Edison] for the transmission line project referenced in the [SAC], then Landbank, as buyer, and [Tierra and Foothills] as sellers, entered into the contract under a material, mutual mistake of fact in that the parties to the agreement were informed and believed

9

that condemnation actions were pending or threatened involving the real property being sold, as set forth in the representation and warranty of sellers set forth in [the Disclosure Provision]."

**D. Landbank's request to amend**

The matter was scheduled for a jury trial on February 8, 2012. On January 10, 2012, Royal, Tierra, and Foothills filed a motion in limine for an order prohibiting Landbank, its counsel, and its witnesses from presenting testimony or argument that the 2007 Notice sent to Royal, Tierra, and Foothills constituted a condemnation proceeding or that the Property was subject to a pending condemnation proceeding prior to Landbank's purchase of the Property. Royal, Tierra, and Foothills urged that Royal, Tierra, and Foothills "have recently come to learn that [Edison's] Application itself and the accompanying project maps existing in 2007, included as the [environmental assessment] filed along with the Application show that [Edison] did not have a plan in place for the taking alleged in [Landbank's TAC]. No plan had been proposed by [Edison] to the [Commission] to place power lines across or through the [Property]. In fact, the maps incorporated in the Application shows the proposed transmission line on the east side of 110th Street, which is not along or across the [Property] (which [is] located south of Avenue J and west of 110th Street[)]." The trial court overruled Tierra and Foothills' motion in limine.

Landbank then filed a motion to amend the TAC "to clarify the fact that the Notice . . . served on June 29, 2007, constitutes a threatened condemnation proceeding, rather than a pending proceeding." Specifically, the proposed fourth amended complaint deleted language in Paragraph 22 relating to the initiation of a condemnation proceeding by Edison and added the allegation that the service of the 2007 Notice "advised the owners of the . . . Property of an investigation by the . . . Commission and/or [Edison] which threatened a condemnation proceeding *relating* to the [Property]." (Italics added.) In support of the motion to amend the TAC, Landbank's counsel attached his declaration stating, that until Royal, Tierra, and Foothills filed their motions in limine, Landbank and its counsel believed that, at the time the Purchase Agreement was signed, the Project was

10

to include transmission lines that ran "through" the Property. Landbank's counsel declared that the only statement made by Tierra and Foothills's counsel was "the general statement that the transmission line does not run through any portion of the . . . Property at the present time. As a result of that assertion, I took the deposition of Clair 'Don' Clark, the Person Most Qualified to Testify from [Edison] regarding the location of the transmission lines and it was confirmed that they were to be located within the [Property] when built."

Royal, Tierra, and Foothills prepared an "itemized statement of prejudice and costs if [Landbank] is granted leave to amend," in the amount of $94,550.73 for "the worked [*sic*] value lost because of [Landbank's] decision to proceed with its false Third Amended Complaint" and $93,750 for "the anticipated future costs necessitated by the Fourth Amended Complaint."

On February 8, 2012, the trial court conditioned the granting of Landbank's motion for leave to amend on Landbank's payment to Royal, Tierra, and Foothills the sum of $50,042.00. Landbank chose to proceed to trial without amending the TAC.

**E. The trial**

On February 9, 2012, after Landbank made its opening statement, Royal, Tierra, and Foothills made a motion for nonsuit, arguing that Landbank's opening statement did not identify any evidence to prove the allegations of the TAC. The trial court denied the motion, stating that it would revisit it after Landbank rested its case in chief.

Proulx testified that neither Tierra nor Foothills gave him any information "relating to a threatened or pending condemnation" by Edison. Prior to escrow closing, Proulx did not have any information "pertaining to a threatened or pending electrical transmission project going through [the Property], or along it." In February 2009, Proulx received the 2009 Notice from Edison that stated, "The new 500-kV transmission line . . . currently proposed along 110th Street West in Lancaster would be re-routed 0.5 miles farther west along 115 Street West." In the meantime, Proulx had "greatly increased the value of the [P]roperty through our approval process. [¶] It went from just raw land to having an undivided interest land subdivision approved." After Proulx discovered the

11

existence of the Project, Goltche told him that "he didn't have to disclose the [P]roject because it wasn't a solid project." Proulx described the 2009 Map as showing a blue line running southbound on 110th Street West and a pink line running southbound on 115th street. He stated, "The blue line looks like it's going right down the middle of the street and flops a little to the east and flops a little bit to the west. . . . [¶] [The Property] would be to the right-hand side of the blue line. [¶] The pink line that's titled 'West Lancaster Alternative' runs—also runs southbound, but it's on [115th Street, not 110th]. And it runs through the property and then makes a ninety-degree turn and then goes out the other end of the property. [¶] So the blue line goes down the east side of the [Property], and the pink line goes in the middle of the [Property] and turns to the [east]." Proulx stated that he could not offer the Property to his investors because the huge 145-foot tall transmission towers and lines going "over the very front of the [P]roperty or . . . halfway through the [P]roperty" made the Property unfit for landbanking. Proulx testified that whether the transmission line went down the east side of 110th Street or down the middle of 115th Street, it adversely affected the value of the Property.

Edison employees and a printing service employee testified in 2007 that packages from Edison relative to the Project were sent using a list of landowners that included Tierra and Foothills. Makhani testified that he did not recall receiving the Edison mailings prior to "August 2007," and that if he had received them, he probably threw them away as junk mail.

Alis Odenthal, manager of the public involvement group for Edison, testified that on March 19, 2007, Edison mailed "initial fact sheets" providing general information about the Project and the 2007 Map showing the proposed route of the transmission lines. The mailings were sent to property owners who were located three hundred feet on either side of the proposed route, in addition to the 200-foot wide easement. The March mailing stated that Edison "will parallel [the existing right-of-way] when we can." The 2007 Map showed a proposed route that ran down the middle of 110th Street. Nine open house meetings were scheduled for the Project. The first one was on April 11, 2007.

12

Odenthal received a comment card regarding alternate routes from a member of the public at an April 19, 2007 open house.

Odenthal testified that the 2007 Application stated that the proposed transmission line ran for two miles on the east side of 110th Street West, but she did "not remember if there were alternates suggested" and would "have to look through the whole document" to refresh her recollection about the alternate routes. She testified that in all its mailings, Edison stated that the Commission "may approve the proposed route, may offer or select an alternative route, or may create its own route." Within 10 days of the filing of the 2007 Application with the Commission, Edison mailed the 2007 Notice to people who owned property along the proposed route. The 2007 Notice provided a brief description of the Project, a general statement of its location, and contact names to obtain additional information. As relevant here, the 2007 Notice stated that at segment four, Edison planned to construct a new 16-mile transmission line and two new four-mile transmission lines. The 2007 Notice stated that 200 feet of new rights-of-way would be acquired. As part of the 2007 Notice, Edison included a "Proponent's Environmental Assessment" (environmental assessment) that stated, "Near the Antelope Substation, the line extends west from the substation along the south side of W Avenue J-8 for approximately 1.5 miles, and then turns north at S4MP 17.9 for approximately 2 miles along the east side of 110th Street W." The environment assessment stated that the Project included new 200-foot wide rights-of-way for 20 miles. The 2007 Notice addressed Edison's measures to reduce public exposure to electric and magnetic fields; the procedure for making formal protests to the applications and hearings; and the address for sending letters to the Commission. The 2007 Notice advised property owners of nine open houses.

Susan Nelson, a strategic planning manager for Edison, testified that she was part of a team that put together the 2007 Application to the Commission. The 2007 Application submitted by Edison indicated that the proposed transmission line ran for two miles on the east side of 110th Street West. The transmission line was not designed to cross "any properties within a quarter of a mile west of [Avenue 110].) The Project in 2007 required a new 200-foot right-of-way along 20 miles of the proposed route. At the

13

time the 2007 Application was filed, the exact location of the 200-foot right-of-way had not yet been established.  Information contained in the 2007 Notice to property owners, Edison Web site, and Edison service centers explained that a new 200-foot wide right-of-way would be necessary for the Project.  In December 2007, the Commission requested additional information regarding the route.  Edison submitted environmental information to the Commission regarding an alternate route in 2009.

Larry Webb, a commercial real estate appraiser, testified that the value of the Property in August 2007 for the "entire [158] acres, including the transmission line corridor right of way" was $3,172,000.  The value of the property, "excluding the twenty-three acres that was to be acquired for the transmission line right of way," was $2.7 million, or approximately $20,000 per acre.  The value of the Property with the transmission line corridor and transmission line "built there" was $1,220,000, or approximately $9,000 per acre.  He concluded that "after the taking," the value diminished based on the loss of revenues as a result of the reduction in lot size; the visual impact of a transmission line corridor on two sides of the property; the delay in development of the site because of the construction of the transmission lines; the lost opportunity in investment; and the holding costs—including taxes and interest on loans for the property.  He opined that even if the power lines were to be constructed on the east side rather than the west side of the Property, the Property would be impacted and the value would be $9,000 per acre instead of $20,000 per acre.  And even if the power lines were a quarter of a mile away, "there would be some impact."  He stated that the compensation received in the condemnation action in 2010 was less than the "loss of value" from the construction of the transmission lines.

The trial court also stated that it was "not inclined to allow amendments of the pleading at this point that were not allowed before.  [¶]  I think it severely prejudices the defendants going to trial on the basis that the . . . easement was running on their property, and now they have to defend a case where it's running not even on their property but on somebody else's property.  [¶]  And I don't—in my opinion [the Disclosure Provision] I don't think covers that."

14

The trial court entertained Royal, Tierra, and Foothills's motion for nonsuit. The court noted that the documents that Edison mailed to the property owners in June 2007 were inconsistent regarding the proposed route, stating, "Well, I would agree, if you look at the map—and that's all you looked at . . . that it looked just like a line down the center of the street to me that goes both on the left and the right of the line. . . . [¶] . . . [¶] That from the map you couldn't tell if it was on the left or the right or down the middle. . . . [¶] . . . [¶] The problem that you have is that's not the only piece of testimony. If it was the only map, you got it." The court noted that the evidence was "inconsistent" because Nelson had testified that in 2007 the line was planned to run down the east side of the street. Landbank argued that even if the line were "on one side of a thirty foot wide street," a 200-foot wide right-of-way would "bring it onto" the Property. The court stated to Landbank, "And unfortunately for you I have to be governed by the complaint as written, by the way, is a third—I stress a third—amended complaint. Your fourth whack at it. And you're still trying to amend it. [¶] And as I told you before, I didn't think it was fair to the defense to amend it the day before trial started. And it certainly isn't fairer to do it after [defendants have] rested."

The trial court stated that it "[has] to be governed by the complaint as written." The court referred to Paragraph 22, stating, "Notice of application related to [Edison's] project entitled Tehachapi Renewable Transmission Project which called [for]— and here it comes— the construction of giant electrical transmission lines *through the subject property* and other properties in the area." (Italics added.) The court stated, "[T]he maps make a possibility that it runs through the property. It's a possibility. But when you examine the evidence, that possibility was shattered. [¶] [I]t didn't go through the property in 2007. . . . [T]hey first started looking at something else in December of [2007,] which would be over two months after the escrow closed."

The trial court rejected Landbank's argument "to the extent you have an ambiguity about [Paragraph 22], and how it's incorporated in the other paragraphs, it is cured at [Paragraph 66] where it explains that there was a mutual mistake of the parties to agree to

15

inform due to a condemnation action pending or threatened . . . [¶] . . . [¶]—involving the real property being sold as set forth in warranty representation."

On February 16, 2012, the court granted Royal, Tierra, and Foothills's motion "for a directed verdict under Code of Civil Procedure section 630 on the grounds specified in the motion for nonsuit filed by Royal, Tierra, and Foothills." Royal, Tierra, and Foothills served a notice of entry of judgment on February 21, 2012. Landbank appealed. Royal is not a party to this appeal.

## DISCUSSION

## A. The trial court erred in sustaining the demurrer as to the allegations of alter ego against Shakib, Goltche, and Makhani and as to the allegations of intentional and negligent misrepresentation against Shakib and Makhani

### 1. *Standard of review*

"For purposes of this appeal we accept as true the properly pled factual allegations of the complaint. (*Thompson v. County of Alameda* (1980) 27 Cal.3d 741, 746.) Furthermore, the allegations of the complaint must be read in the light most favorable to the plaintiff and liberally construed with a view to attaining substantial justice among the parties. (Code Civ. Proc., § 452; *King v. Central Bank* (1977) 18 Cal.3d 840, 843.) With these considerations in mind, we review the complaint de novo to determine whether it alleges facts sufficient to state a cause of action under *any* legal theory. If it does not, we next determine whether the complaint reasonably could be amended to state a cause of action. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)" (*Westinghouse Electric Corp. v. Newman & Holtzinger* (1995) 39 Cal.App.4th 1194, 1199.)

### 2. *The SAC sufficiently pleaded an alter ego theory of liability*

Landbank contends that the court erred in dismissing the individual defendants by demurrer because the SAC had alleged sufficient facts to plead allegations of alter ego against them.

"While generally *members* of a limited liability company are not personally liable for judgments, debts, obligations, or liabilities of the company 'solely by reason of being a member' (Corp. Code, § 17101, subd. (a)), they are subject to liability under the same

16

circumstances and to the same extent as corporate shareholders under common law principles governing alter ego liability and are *personally* liable under the same circumstances and extent as corporate shareholders. (§ 17101, subd. (b); 9 Witkin, Summary of Cal. Law [(9th ed. 2004 Supp.)] Partnership, § 140, pp. 328–329.)" (*People v. Pacific Landmark, LLC* (2005) 129 Cal.App.4th 1203, 1212 (*Pacific*).) And a manager of a limited liability company is also subject to alter ego liability. (*Greenspan v. LADT, LLC* (2010) 191 Cal.App.4th 486, 495–496.)

"The basic rule stated by our Supreme Court as a guide in the application of [the] doctrine [of alter ego] is as follows: The two requirements are (1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow. [Citations.]" (*Associated Vendors, Inc. v. Oakland Meat Co.* (1962) 210 Cal.App.2d 825, 837.) The familiar litany of factors showing alter ego include the commingling of funds; unauthorized diversion of corporate funds to other than corporate uses; "treatment by an individual of the assets of the corporation as his own"; "failure to maintain minutes or adequate corporate records"; identical equitable ownership in entities; failure to adequately capitalize corporation; "absence of corporate assets and undercapitalization"; "use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual"; "diversion of assets from a corporation by or to a stockholder or other person or entity, to the detriment of creditors"; "the manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another"; "contracting with another with intent to avoid performance by use of a corporate entity as a shield against personal liability"; and "use of a corporation to transfer to it the existing liability of another person or entity." (*Id.* at pp. 838–840.)

In *First Western Bank & Trust Co. v. Bookasta* (1968) 267 Cal.App.2d 910 (*First Western*), the appellate court held: "It is not even essential, apparently, that actual fraud be specifically alleged or that the *alter ego* doctrine always be specifically pleaded in the complaint in order for it to be applied in appropriate circumstances. [¶] 'There appears

17

to be some authority to the effect that the *alter ego* doctrine must be pleaded in the complaint. . . . There is also authority, however, that where a defendant is charged with liability his denial thereof is sufficient to establish such liability upon the principle of *alter ego* even though the complaint is devoid of such an allegation.' [Citation.] It therefore appears that the courts have followed a liberal policy of applying the *alter ego* doctrine where the equities and justice of the situation appear to call for it rather than restricting it to the technical niceties depending upon pleading and procedure. It is essential principally that a showing be made that both requirements, *i.e.,* unity of interest and ownership, and the promotion of injustice by the fiction of corporate separate existence, exist in a given situation. [Citation.]" (*First Western*, at p. 915.)

First Western held that the following allegations were adequate to state a cause of action against the defendant on an alter ego theory: "that the individuals . . . 'dominated' the affairs of the corporation; that a 'unity of interest and ownership' existed between respondent and the corporation; that the corporation is a 'mere shell and naked framework' for individual manipulations; that its income was diverted to the use of the individuals and respondent; that the corporation was, in effect, inadequately capitalized; that the corporation failed to issue stock and to abide by the formalities of corporate existence; that the corporation is and has been insolvent; and that adherence to the fiction of separate corporate existence would, under the circumstances, promote injustice." (*First Western*, *supra*, 267 Cal.App.2d at pp. 915–916.) The court held that assuming those facts could be proved, the shareholders of the corporation "may be held liable as principals or partners under the *alter ego* principle." (*Id*. at p. 916.)

We conclude that under *First Western*, Landbank made sufficient allegations of alter ego to avoid a demurrer. Landbank alleged that there existed a unity of interest and ownership between Shakib, Goltche, and Makhani and Royal, Tierra, and Foothills such that any separateness had ceased; Royal, Tierra, and Foothills were mere shells and conduits through which Shakib, Goltche, and Makhani exercised complete dominion and control; Shakib, Goltche, and Makhani were using Royal, Tierra, and Foothills as a conduit for their personal business; Shakib, Goltche, and Makhani had removed

18

Landbank's purchase proceeds from Royal, Tierra, and Foothills, leaving them unable to satisfy debts, including a money judgment arising from the action; Shakib, Goltche, and Makhani had removed Landbank's purchase proceeds from Royal, Tierra, and Foothills for their own benefit; after Landbank made several payments to Investment Property Exchange Services, Inc., Shakib, Goltche, and Makhani had Investment Property Exchange Services, Inc. assign its interest back to them; adherence to the fiction of the separate existence between Royal, Tierra, and Foothills and Shakib, Goltche, and Makhani would permit an abuse of the limited liability privilege and would sanction fraud and promote injustice; and Shakib, Goltche, and Makhani failed to follow corporate formalities, such as failing to hold regular meetings and failing to maintain minutes and adequate records to show the separate relationship between the two parties.

Nevertheless, Shakib, Goltche, and Makhani argue that the SAC failed to allege specific facts to support an alter ego theory against them, citing *Vasey v. California Dance Co., Inc.* (1977) 70 Cal.App.3d 742. But in *Vasey*, unlike here, the plaintiff merely had pleaded "a bare conclusory allegation that the individual and separate character of the corporation had ceased and that [the corporation] was the alter ego of the individual defendants." (*Id*. at p. 749.) Similarly, Shakib, Goltche, and Makhani's citation to *Stansfield v. Starkey* (1990) 220 Cal.App.3d 59 does not assist them. There, the appellate court held that the plaintiff's alter ego allegations were inconsistent with other allegations and failed "to include *facts* showing a unity of interest and a resultant injustice, prerequisites to an alter ego theory." (*Id*. at p. 74.) Here, on the other hand, the SAC alleged the same allegations that passed muster in *First Western* and made specific factual allegations that the individual defendants had removed Landbank's purchase proceeds from Royal, Tierra, and Foothills for their own benefit, leaving the corporate entities unable to satisfy debts, including a money judgment arising from the action; and that after Landbank made several payments to Investment Property Exchange Services, Inc., Shakib, Goltche, and Makhani had Investment Property Exchange Services, Inc., assign its interest back to them. Further, the SAC specifically alleged the lack of

19

corporate formalities, including failing to hold regular meetings and failing to maintain minutes and adequate records.

And "[i]n permitting allegations to be made in general terms the courts have said that the particularity of pleading required depends upon the extent to which the defendant in fairness needs detailed information that can be conveniently provided by the plaintiff, and that less particularity is required where the defendant may be assumed to possess knowledge of the facts at least equal, if not superior, to that possessed by the plaintiff." (*Burks v. Poppy Construction Co.* (1962) 57 Cal.2d 463, 474.)  Because the individual defendants possessed knowledge of the facts superior to that possessed by Landbank, the requirement of particularity of pleading is lessened.

Accordingly, we conclude that the trial court erred in granting the demurrer of Shakib, Goltche, and Makhani on the basis that the SAC failed to allege alter ego with specificity.

**3.**  ***The SAC alleged with specificity the causes of action for intentional and negligent misrepresentation against Shakib and Makhani***

Landbank contends that the SAC alleged sufficient facts to state causes of action for intentional and negligent misrepresentation against Shakib and Makhani.  We agree.

"'The elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.' [Citations.]" (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638.)  "The tort of negligent misrepresentation does not require scienter or intent to defraud.  [Citation.]  It encompasses '[t]he assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true' (Civ. Code, § 1710, subd. 2), and '[t]he positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true' (Civ. Code, § 1572, subd. 2; see *Fox v. Pollack* (1986) 181 Cal.App.3d 954, 962 [describing elements of the tort])."  (*Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 173–174.)

"In California, fraud must be pled specifically; general and conclusory allegations do not suffice.  [Citations.]  'Thus "'the policy of liberal construction of the pleadings . . . will not ordinarily be invoked to sustain a pleading defective in any material respect.'"  [Citation.]  [¶]  This particularity requirement necessitates pleading *facts* which "show how, when, where, to whom, and by what means the representations were tendered.'"  [Citation.]  A plaintiff's burden in asserting a fraud claim against a corporate employer is even greater.  In such a case, the plaintiff must 'allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written.'"  (*Lazar v. Superior Court*, *supra*, 12 Cal.4th at p. 645.)

*Pacific* holds that "whereas managers of limited liability companies may not be held liable for the wrongful conduct of the companies *merely* because of the managers' status, they may nonetheless be held accountable under Corporations Code section 17158, subdivision (a) for their personal participation in tortious or criminal conduct, even when performing their duties as manager." (*Pacific*, *supra*, 129 Cal.App.4th at p. 1213.)

The SAC alleged that by virtue of the Disclosure Provision Shakib and Makhani represented on behalf of Tierra and Foothills, respectively, that there was no pending or threatened administrative proceeding or condemnation action relating to the Property or any part thereof.  It further alleged that Shakib and Makhani made this representation knowing its falsity or having no reasonable ground to believe its truth, with the intent to induce Landbank to enter into the Agreement and purchase the Property.  No more is needed.

Accordingly, we conclude the trial court erred in concluding that the SAC failed to allege with specificity the causes of action for intentional and negligent misrepresentation against Shakib and Makhani.

21

**B. The trial court erred in granting the motion for nonsuit**

### *1. Standard of Review*

"A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit a jury to find in his favor." (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291.) "'The order [granting nonsuit or directed verdict] may be made only when there is *no substantial conflict in the evidence*. In ruling on the motion, the court *does not consider credibility of witnesses* but gives to the evidence of the party against whom it is directed *all its legal value,* indulges every legitimate *inference* from such evidence in favor of that party, and *disregards conflicting evidence*.' (7 Witkin, Cal. Procedure [(4th ed. 1997)] Trial, § 419, p. 480, original italics.) The same test applies to the appellate court. (*Osborn v. Irwin Memorial Blood Bank* (1992) 5 Cal.App.4th 234, 259.)" (*Gouskos v. Aptos Village Garage, Inc.* (2001) 94 Cal.App.4th 754, 758 (*Gouskos.*) We review an order granting a motion for nonsuit or a directed verdict de novo. (*Thrifty Payless, Inc. v. Mariners Mile Gateway, LLC* (2010) 185 Cal.App.4th 1050, 1060 [motion for nonsuit]; *Brassinga v. City of Mountain View* (1998) 66 Cal.App.4th 195, 210 [directed verdict].)

Here, as in *Gouskos*, "[t]he reporter's transcript indicates that the trial court granted a motion for nonsuit; but the judgment indicates that the trial court granted a motion for directed verdict. Though the trial court's ruling is an issue on appeal, the nature of the order is immaterial given that the scope of review for orders granting nonsuits and directed verdicts is the same. (7 Witkin, Cal. Procedure, [*supra*], Trial, § 419, p. 480.)" (*Gouskos*, *supra*, 94 Cal.App.4th at p. 757, fn. 2.)

### *2. The trial court erred in granting Tierra and Foothills's motion for nonsuit because substantial evidence supported one or more causes of action against them*

Landbank argues that the court erred in granting the motion for nonsuit because substantial evidence supported one or more causes of action. We agree.

The gravamen of the causes of action for rescission and breach of contract alleged in the TAC was that Tierra and Foothills breached the Disclosure Provision because Shakib, Goltche, and Makhani did not disclose to Landbank that there was a pending or

22

threatened condemnation action relating to the Property prior to the close of escrow. As stated, the Disclosure Provision provided, "Litigation. Except as otherwise disclosed in the Due Diligence Items or any other information delivered to Buyer, there is no litigation, arbitration, or other legal or administrative suit, action, proceeding or investigation of any kind pending or threatened in writing against or involving Sellers relating to the Property or any part thereof, including, but not limited to, any condemnation action relating to the Property or any part thereof." (Underscoring omitted.)

We conclude that, viewing the evidence in the light most favorable to Landbank as we must, the evidence was sufficient to defeat Tierra and Foothills's motion for nonsuit because a jury could infer that Tierra and Foothill had knowledge of, and failed to disclose, a threatened condemnation action "*relating to the Property or any part thereof.*" (Italics added.) Evidence was introduced showing that on March 19, 2007, all landowners affected by the Project, including Tierra and Foothills, were mailed fact sheets providing a general description and location of the Project and the 2007 Map. And Tierra and Foothills are deemed to have received such information pursuant to the civil presumption that a letter correctly addressed and properly mailed is presumed to have been received. (Evid. Code, § 641 [letter correctly addressed and properly mailed presumed received in ordinary course of mail].)

A jury could infer that the Project threatened a condemnation action "relating to the Property or any part thereof." The 2007 Map showed the proposed route of the transmission lines running down 110th Street. The 2009 Map showed the proposed route that ran down 110th Street and the West Lancaster alternative route that ran down 115th Street. In describing the route that ran down 110th Street as displayed in the 2009 Map, Proulx stated, "The blue line looks like it's going right down the middle of the street and flops a little to the east and flops a little bit to the west. . . . [¶] [The Property] would be to the right-hand side of the blue line." Even the trial court noted that the 2007 Map appeared to show that the proposed route was on the Property, stating, "It looked just like a line down the center of the street to me that goes both on the left and the right of the

23

line. . . . [¶] . . . [¶] That from the map you couldn't tell if it was on the left or the right or down the middle.

And both the 2007 Notice that was sent to Tierra and Foothills and the environmental assessment included in the 2007 Notice stated that Edison would acquire 200 feet of additional rights-of-way. Therefore, even if the jury concluded that the transmission lines themselves were not designed to go across the Property in 2007, a jury could conclude that the 200-foot right-of-way could impact the Property and therefore that the Project threatened a condemnation action "relating to the Property or any part thereof."

Further, Proulx and Webb testified that the value of the Property would be adversely affected whether the power lines were constructed on the east side of the Property or the west side. Webb stated that even if the power lines were a quarter of a mile away, "There would be some impact." He stated that compensation received in the condemnation action in 2010 was less than the "loss of value" from the construction of the transmission lines. Therefore, there was substantial evidence from which a jury could infer that the Project related to the Property.

Because there was evidence that Edison sent its mailings to all landowners who could be impacted by the Project; that in all its mailings, Edison stated that the Commission "may approve the proposed route, may offer or select an alternative route, or may create its own route"; and the 2007 Map and 2007 Notice showed the proposed route was on 110th Street, a jury could have reasonably concluded that Tierra and Foothills had knowledge before escrow closed on the Property that the Project threatened a condemnation action "relating to the Property or any part thereof," but failed to make that disclosure.

Nevertheless, ignoring the terms of the Disclosure Provision, Tierra and Foothills urge that the phrases "initiated a condemnation proceeding" and "through the Subject Property" contained in Paragraph 22 mandate that Landbank had to establish that the 2007 Notice initiated a condemnation proceeding and that "a condemnation proceeding was *pending* related to construction of electrical transmission lines *through* the property."

24

Tierra and Foothills also point to Paragraph 31 of the TAC, which states, "[A]t no time prior to close of escrow was Landbank aware that [Edison] intended to construct giant electrical transmission lines across any portion of the . . . Property." Tierra and Foothills argue that the evidence was insufficient to permit a jury to find in favor Landbank as a matter of law because in 2007 "there was no evidence that the proposed transmission lines ran through the . . . [P]roperty." Tierra and Foothills urge that "[t]he evidence showed a mere *possibility* that the proposed route could run through the [P]roperty, a possibility dispelled by other uncontradicted evidence."

We disagree that such a strict construction of Paragraph 22 is warranted. Because Paragraph 22 was alleged on information and belief, we conclude it was error for the trial court to strictly construe such allegations.

"In all cases of a verification of a pleading, the affidavit of the party shall state that the same is true of his own knowledge, except as to the matters which are therein stated on his or her information or belief . . . ." (Code Civ. Proc., § 446.) "Plaintiff may allege on information and belief any matters that are not within his personal knowledge, if he has information leading him to believe that the allegations are true." (*Pridonoff v. Balokovich* (1951) 36 Cal.2d 788, 792.) Less certainty is required in allegations made on information and belief than in pleading facts presumptively or actually within the knowledge of the plaintiff. (*Lewis v. Beeks* (1948) 88 Cal.App.2d 511, 521.) Furthermore, "Matters alleged on 'information and belief' do 'not serve to establish the facts . . . because an affidavit which is to be used as evidence must be positive, direct and not based upon hearsay.' [Citation.] A ruling 'of the court is to be based upon facts which may be presented to it, and not upon the belief of the affiant.' [Citation.] Such allegations on 'information and belief' furnish ""no proof of the facts stated . . . ."' [Citations.]" (*Star Motor Imports, Inc. v. Superior Court* (1979) 88 Cal.App.3d 201, 204–205.)

And "[t]he California Legislature explicitly repudiated the common law view that a pleading must be taken most strongly against the pleader and adopted a rule of liberal construction. Code of Civil Procedure section 452 provides in full: 'In the construction

25

of a pleading, for the purpose of determining its effect, its allegations must be liberally construed, with a view to substantial justice between the parties.' This rule of liberal construction means that the reviewing court draws inferences favorable to the plaintiff, not the defendant." (*Perez v. Golden Empire Transit Dist.* (2012) 209 Cal.App.4th 1228, 1238.) "'[W]e give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.]'" (*Id.* at p. 1235.) In *Perez*, the plaintiff generally alleged that she had complied with the government tort claims presentation requirement. The appellate court reversed the trial court's order sustaining the defendant's demurrer, holding that the plaintiff's specific allegation that she had "'subsequently provided the date of the incident to said representative, thus complying with the requirements of the government tort claim statute,'" could be interpreted to mean that the plaintiff provided the date to the representative by amending the claim, thus making the specific allegation of compliance consistent with the general allegation of compliance with the tort claims presentation procedure. (*Id.* at pp. 1238–1239.)

Accordingly, we read Paragraph 22 in conjunction with the Disclosure Provision, which was contained in the Purchase Agreement attached as an exhibit to the SAC. Pursuant to the Disclosure Provision, Landbank had to establish that in 2007 Tierra and Foothills knew of a threatened condemnation action relating to the Property but failed to disclose it to Landbank. And as stated, a jury could have reasonably concluded that the information sent to Tierra and Foothills, including general descriptions of the Project and the 2007 Map, was sufficient to put them on notice that Edison was planning or threatening to construct 140-foot towers carrying 500kv transmission lines relating to the Property.

We also conclude that Tierra and Foothills were on notice of the charges against them, and we disagree that they would have been prejudiced had the trial court permitted an amendment during trial to conform to proof. "[A]fter commencement of trial, in the furtherance of justice, and upon such terms as may be proper, [the trial court] may allow the amendment of any pleading." (Code Civ. Proc., § 576.) The court considers whether facts or legal theories are being changed and whether the opposing party will be

26

prejudiced by the proposed amendment. (*City of Stanton v. Cox* (1989) 207 Cal.App.3d 1557, 1563.) Thus, where the plaintiff claimed she was paid less than male division managers and the higher pay of the plaintiff's subordinates and predecessors was the subject of discovery and opening statements and was introduced into evidence at trial, the trial court erred in denying the plaintiff's motion to amend her complaint during trial to allege that her employer paid male subordinates and predecessors—rather than male division managers—more than the plaintiff. (*Brady v. Elixir Industries* (1987) 196 Cal.App.3d 1299, 1302–1304, disapproved on other grounds in *Turner v. Anheuser-Busch, Inc*. (1994) 7 Cal.4th 1238, 1251.) It is difficult to see how Tierra and Foothills's defense would have been different had Landbank been allowed to amend its complaint at trial to conform to the language of the Disclosure Provision because Makhani testified that he did not receive the March 2007 mailings, 2007 Notice, or 2007 Map and therefore was unaware of the Project. And as stated, evidence regarding whether the route proposed in 2007 was on the east or west side of 110th Street and the proposed 200-foot right-of-way was introduced at trial. Proulx testified that Tierra and Foothills did not give him information as of the close of escrow pertaining to a threatened or pending electrical transmission project affecting the Property. And during trial, Tierra and Foothills's counsel cross-examined Proulx regarding the different maps and Webb about the value of the Property if the transmission lines were constructed on the east side of 110th Street.

In any event, the fifth cause of action for rescission based on mutual mistake alleged that the parties were under a mutual mistaken belief that no "condemnation actions were pending or threatened involving the real property being sold, as set forth in the representation and warranty of sellers set forth in [the Disclosure Provision]." As noted above, a jury could have reasonably concluded that the information sent to Tierra and Foothills, including general descriptions of the Project and the 2007 Map, was sufficient to put them on notice that Edison was planning to or threatening to construct 140-foot towers carrying 500kv transmission lines relating to the Property.

27

Accordingly, we conclude the trial court erred in granting Tierra and Foothills's motion for nonsuit on the causes of action for rescission and breach of contract.

## DISPOSITION

The judgment is reversed.  Landbank is entitled to costs on appeal.

NOT TO BE PUBLISHED.


                                        MALLANO, P. J.

We concur:


ROTHSCHILD, J.


JOHNSON, J.